Good morning, Your Honors, and may it please the Court, John Malgren on behalf of Petitioner Appellant WILDEARTH GUARDIANS. I'm joined at Council Table by Kelly Noakes, and I intend to reserve approximately five minutes for rebuttal. We'll see how that works. I intend to discuss two key points this morning in our brief time together. First, I intend to discuss the Forest Service's failure to conduct a site-specific analysis and gather baseline information regarding the Tennessee Creek Project area, and second, the importance of the different habitat types for Canada lynx and their distribution on the landscape. Before I jump in, I'd like to emphasize one thing. This case is not about opposition to logging generally. This case is not intended to place roadblocks in Forest Service implementation of needed projects. Indeed, WILDEARTH GUARDIANS was clear throughout the administrative process here that it supported many aspects of the Tennessee Creek Project, but the Forest Service can't ignore the law, and it must meet, as the Supreme Court calls, NEPA's twin objectives. One, informed decision-making, and two, public participation, and that's lacking here. This Court's decision in New Mexico, X. Rel. Richard Simm. Before we get to the law, I'd like to get the facts straight about what's going on here if we could. Of course. So there are two LAUs, Lynx Analysis Units, involved here. Is that correct? There are two LAUs within the project area. How are they determined, and what does it mean to be an LAU? Sure. An LAU stands for Lynx Analysis Unit, and under the Southern Rockies Lynx Amendment, which now is about a decade old, it required the Forest Service to identify on the landscape habitat blocks that approximate the range of a female Canada lynx. They don't necessarily correspond to an actual live Canada lynx on the landscape, because that would be an impossible task to ask of the Forest Service. But it looks at the habitat on the landscape and whether it provides, generally, the habitat components that a female lynx might use. When you say generally, the types of trees growing there, they don't just take some 6,400 acre area and say that's an LAU. What sort of criteria does it have to satisfy, and what does that mean with respect to lynx habitat itself? Sure. So the LAU is supposed to contain all the habitat types that are necessary for lynx on the landscape to persist. So it's going to look at the types of vegetation, whether it has the different habitat types, which I intend to discuss later, the denning habitat, foraging habitat, and also connectivity, and then the distribution on the landscape as well. So it actually looks at the area and says, this is denning habitat, or it just infers that from the type of trees growing there and the ages of the trees? My understanding is that it doesn't drill down to that level of specificity, but it's generally looking at, is there a large enough habitat block here to support a female lynx, and the types of vegetation growing in that area would support the different parts of the denning habitat, but it doesn't require the Forest Service to go out and map this giant block of habitat and say, okay, here's the denning habitat. Does it do anything site-specific in your terms? Correct. Then you have the SRLA? The Southern Rockies Lynx Amendment, yes. And as I understand it, correct me where I'm wrong, that sets standards for how you manage the LAUs in particular, and says you shouldn't do these things, if you're going to do these things, it should be limited to 1% of the size of the LAU, things like that. Is that correct? Correct. The standards impose caps on logging within the LAU, and there are some other restrictions that apply outside of an LAU too, but generally the SRLA also is looking across the entire Southern Rockies, and how much habitat could the Canada lynx afford to lose across the entire Southern Rockies, and how it does that is through the LAU analysis, and okay, you can log up to 15% of an LAU in these circumstances, only 1% in this circumstance, there's an exception for X, et cetera. And that amendment was the product of an environmental impact statement and notice in common, is that correct? It was a decade ago. So, as I understand what the Forest Service explanation for what happened here is, they have these LAUs, they follow the SRLA, and say, and they've complied with that, what's unreasonable about that approach? I should add one thing. They looked at their project, and they assumed the maximum impact on the LAUs. They said that's unlikely, very unlikely to happen, but they assumed the maximum impact, and they said, all those, as I'm understanding it, all those impacts on the LAUs are within the guidelines, the allowances of the SRLA. What's unreasonable about that? Is your concern that they misread the SRLA, or the SRLA is bad? What's the problem? Sure. So, I think the really key point here is the SRLA imposes one set of restrictions and standards, and then the National Environmental Policy Act requires different things. So, certainly, the SRLA requires the Forest Service to look at, are they going to meet the 15% cap, are they going to meet that 1% cap, and all of those things. Importantly here, we're not challenging anything under the SRLA, and the appropriate vehicle for that would be a challenge under the National Forest Management Act. There is no NFMA claim here. We only have NEPA claims. So, you're not challenging that this project would violate the SRLA? What we're saying is that we don't think you can actually know without knowing what the landscape looks like. Here, the Forest Service admits that they will be looking at the landscape as they implement, determining where the high-quality lynx habitat exists, protecting that area when they find it, but they just don't know that right now. Is that going to become public? This project is to be spread over 10 to 15 years. They're doing it in small pieces. Is that information going to not be made public as they look at a small area, year one, they look at a small part of this area, is the information that they gather not going to be public information as they go along? There's nothing in the decision that the Forest Service commits to disclosing that to the public. Theoretically... There's nothing that indicates they won't. There's nothing saying that they will not disclose that, but nothing requires them to. Theoretically, my client could file a freedom of information request every month asking for that data and information, but there's nothing affirmatively providing that to the public. And most importantly, there's no mechanism for the public to comment on that and provide its input as to what the Forest Service plans as it implements. And I think that the New Mexico XREL Richardson decision, although it's an oil and gas leasing case, I think the background of that case highlights what's at issue here, where there they had a broader NEPA analysis, and then they committed to, or at different stages of the leasing process, they prepared environmental assessments to deal with the more site-specific impacts. In one case, the Forest Service sites is a DC circuit case, the Theodore Roosevelt case, and there the DC circuit said, yes, flexibility due to changing conditions on the landscape for a very long project matter, and it's important. And my client, Wild Earth Guardians, completely agrees with that, that flexibility is important. But, in that Theodore Roosevelt case, the agency committed to conducting those future environmental assessments, those future NEPA analyses, which would allow the public to comment, which would require that disclosure of information of the site-specific impacts that would be felt over 10 years. I mean, 10 years is a very long period. Yeah, but what is different here is that the Forest Service looked at the project and said, let's assume the maximum impact from this. The SRLA says you shouldn't do more than, you shouldn't clear-cut more than 1% of the acreage in a LAU, something like that. I'm talking about the principle here, rather than getting the exact facts right. And the project, and the Forest Service says, look at this project, and if everything, if we do the maximum damage, it'll be less than 1% clear-cutting in the LAU. And that's within the SRLA guidelines. So, what is wrong with doing that? Why do they have to go look at specific areas, which they can't predict because this is going to depend on infestations, fire dangers, things like that, so they can't predict for sure where they're going to go. What's wrong with saying, if we do the maximum, it's within the SRLA guidelines for management of the LAUs? What's wrong with that? I think what I'd say is a point I made earlier, in that that might comply with the Southern Rockies Links Amendment, but because we don't have that site-specific and baseline information, we can't really know. You're not going to get it. They don't know. To say that you're not trying to stop this, you think this is fine, but ask them to do something that they can't possibly do, sounds like you just don't want anything done. That's what it sounds like, but tell me what's wrong. You say they need site-specific. Why do they need site-specific when, one, they can't be site-specific at this point, and second, even if you were site-specific, the total damage would be less than what the in some cases even helpful for the links. I'm sure you're addressing that. Yeah. I guess my first point is, the Forest Service admits that they did pre-identify certain units, so they know where they're going to implement certain pre-commercial thinning logging. There's no reason why they can't take a site-specific analysis at a minimum. They may not do that for seven years. They might not actually conduct the ground operations, but they say in their environmental assessment that they pre-identified certain units, so they know where on the landscape they intend to do it. Maybe it doesn't happen for seven years, but they know now where they intend to do those operations, so a site-specific analysis could happen since they know where that would happen. I think also importantly is this baseline information. In the Richardson case, the baseline information, the only argument you get for that is to make sure they're not cheating. The EA is to say, if we do what we say we're going to do, what's the damage? It's not to say, if we lie to everybody and don't do that, what's the damage? I don't know any ... You haven't given any authority for saying, you have to produce baseline information so we can see if you're telling the truth. Do you have any authority for that? I think the Richardson case says that. In the section talking about impacts to wildlife habitat in that case, this court explicitly said that where you're going to implement on the landscape is vitally important for wildlife, because there's a huge difference between going on the outside of habitat versus right down the middle. That case talks about how you can't assess the effects without that fundamental information. What does the landscape look like now? That's a fundamental concept in NEPA, that you have to gather this baseline evidence because you can't ascertain the effects without knowing what the landscape looks like now. For the Forest Service to say, yes, we're going to comply with the SRLA because of just looking at the gross acreage is very different than the distribution question, which is uncontroverted in the record. The Forest Service and the U.S. Fish and Wildlife Service, the expert agency here about threatened and endangered species, says it's not just the gross acreage, but the distribution. For denning habitat to be functional, it has to be near foraging habitat. If you don't know the relationship between the two and where they are on the landscape, you can't actually say that the denning habitat will actually serve as denning habitat and provide that habitat for lynx. Is that habitat not going to change over a 10 to 15 year period? It could. Don't they have to do this as they go along? I think that would make sense. Just like what happens in the oil and gas context and what happens in the Theodore Roosevelt case from the D.C. Circuit, where they prepare the broader analysis about the general effects, and then as they implement over a 10 or 15 year period, they prepare the smaller analyses and say, okay, we're going to log in this piece of land. Here's what the habitat is going to look like when we're done. There's not going to be adverse effects to lynx. With the court's permission, I'd like to save my last 30 seconds. We're going to give you plenty of time for this. Okay. Thank you. The one thing I don't want you to do by reserving time is then raise a new argument on rebuttal that the government didn't have a chance to respond to. Do you have any arguments? I think the one last thing that I would point this court's attention to is the Dombeck case that the Forest Service relies on to support its analysis. There, the Forest Service did exactly the analysis that my clients are asking for and that we assert is required by NEPA. In the Dombeck case, in note 11 of that decision, this court explicitly notes that why the NEPA analysis there was sufficient was because, in part, they had identified where on the landscape denning habitat was, where the foraging habitat was. They both quantified it, not only in the project area, but they described it as the landscape area, the region, and the eastern portion of that national forest. This is possible to do. There's no reason here why the Forest Service could not have done that, at least for that baseline information. Let's see what does the landscape look like now so that when we go out and do the logging, we'll know exactly what those effects are going to be. Thank you. Good morning. May it please the court. I'm Summer Ingalls for the United States Forest Service, and we ask this court to affirm. At its core, the Tennessee Creek Project is designed both to preserve and to protect lynx habitat from the variety of problems currently facing the project area. This includes the spread of mountain pine beetles, spruce pine beetles, and the fact that the forest in its current state is overly dense and therefore susceptible to high intensity wildfires that could spread quickly and destroy the entire project area. Because the problems at issue are dynamic, the forest designed a project that will enable it to tailor its treatments in response to the dynamic problems facing the forest within small regions, and that's where the site-specific implementation will occur at the stand level. But the service also designed this project to ensure that treatments occur within well-defined parameters and to ensure that mitigation and treatment prescriptions occur in the forest in a way that will both preserve and protect lynx habitat. As you go along over this 10 to 15 year period in small doses, is the information going to be public as to what you find? I don't know at this time whether the Forest Service has a particular plan to disclose that information, but there's nothing in the record to indicate that the Forest Service will not disclose it if requested. How does it get requested? Don't we have to know that? I think it could be requested through FOIA or by connecting with the Forest Service directly. I'm sorry, I don't know. The request through FOIA is a process that takes time, and this is, well, the Forest Service knows what it's going to do. That's true. The record shows that the Forest Service was eager to involve the public in implementation of this project. So you want us to assume they're going to continue to do that? I think it's reasonable to assume that given that the Forest Service has already included the public and invited the public to participate in implementation of the project, that it's not trying or doesn't plan to prevent the public from being aware about where these or does it have plans to keep that information secret? But there are two factors here. One is that you can't know for sure now where the work on the project is going to be, but the reason I thought that you decided an EA was sufficient is because you've looked at the worst possible scenario and looking at worst case scenario and applying the SRLA, it's not going to be a significant impact, negative impact at least, on the links. If you didn't have that, if you hadn't performed the worst case scenario analysis, I'm not sure that the fact that you can't decide now would be an excuse for not having then an environmental impact statement as the project continued and you conducted specific clear cutting or whatever activities. Given the information the Forest Service already knows about this particular area, the types of trees in the, the types of stands in the area, the acreage, the fact that it's already analyzed in great detail when it prepared the SRLA, the links habitat in this area, and the fact that the project's going to be proceeding within very carefully designed parameters, designed to protect high quality links habitat, these are all elements that enable the Forest Service to decide that at this time it had sufficient information to evaluate the impacts and decide that they would not be significant. Certainly if the situation changes, if conditions in the project area develop in a way that lead the Forest Service to believe that there are impacts it has not yet evaluated, it could complete additional analysis. But at this time, the record shows, based on the conservative assumptions and the parameters I've mentioned, that the Service reasonably determined that no further analysis would be necessary or productive to evaluate those impacts. As you've mentioned, the worst case scenario is that if all clear-cutting occurs in high quality links habitat, 6% of each LAU will be rendered unsuitable for a period of 15 to 30 years. And that's well within the parameters set by the SRLA. And yes, that's, that was promulgated under a different statute, but the analysis holds. And the fact is that it provides the best available information about links habitat in this area. And there was notice and comment? Yes. For the SRLA. Was there an environmental impact statement for the SRLA? Yes, there was a complete environmental impact statement for that document. And given that it analyzed the links habitat in this area in great detail, it was reasonable for the Forest Service to determine that because the treatments complied with all of the parameters and guidelines set forth in that document, this project would be unlikely to have significant impact. When you say it analyzed links habitat in detail, I looked at the SRLA amendment and it just has guidelines for treatment. Is there something publicly available that shows where they analyzed the habitat? Yes, the EIS would be the best place to evaluate. It's publicly available now? Yes, yes it is. Could you actually submit it to the court after our argument? I'd be happy to do that. Or is it part of the record now? I think parts of it are included in our excerpts of record. It is included in the entire record. But I'm not sure that the entire document is included in the excerpts. Counsel, just let me, before you move on. So are you arguing that the site-specific, I hear you arguing site-specific didn't need to be done. But I thought part of your argument was it couldn't, it just, we can't do it. Can you help me understand which, what argument you're making? When I say site-specific information, I don't want to make it sound like the Forest Service hasn't already completed site-specific information. As I've explained, it knows a great deal about the project area. But I think there's a difference, a distinction to be made between site-specific and stand-specific information. And as I understand the Wild Earth Guardians argument, that's the type of information they're seeking. Because, as I've explained, the problems in this area can change over time, and the Forest Service has determined that the best treatments will require a quick response. It hasn't identified the areas that need treatment or where it plans to treat the areas. And therefore, it can't disclose where they will occur. Yes, with respect to pre-commercial thinning, it has determined that 345 acres will be pre-commercially thinned. It has identified those areas. Is there any reason why that wasn't disclosed earlier? I do not know why the map wasn't disclosed. I think in terms of evaluating impacts, the Forest Service's position for all thinning is that it will degrade habitat, and that it wasn't necessary to identify with particularity where the treatments were to evaluate the impacts. The record shows on pages 497, 520, 590, 663 to 64 of the appendix. There's additional information about where this pre-commercial thinning will occur. It will occur in logical pine stands that were clear-cut 20 to 30 years ago, and the Service anticipates that 34 acres will occur within Lynx Habitat and the Tennessee Pass LAU, and 31 acres will occur within the massive LAU. Was that information provided before you got public comment? That information is in the EA, yes. So that information was available to the public. That's not new. The EA explains that both of those treatments will be well within standards set by the SRLA because they'll be less than 1% of the Lynx Habitat within each LAU. The other point here is that although the Forest Service hasn't yet identified this particular stand where it anticipates making treatment measures, the map on page 9 of the appellant's opening brief, which is reproduced at the excerpts on page 522, shows that the Forest Service has identified in the 15,000 acre project area four specific areas where it intends to do this treatment. So it's not fair necessarily to describe the project area as a monolithic block. It's identified areas where it anticipates making these treatments, not at the stand level but at a broader level, and it shows where those treatments occur within each LAU. And you also identified no treatment areas? That's true. But was that disclosed beforehand? The no treatment areas were included in the EA. I don't want to make it sound like those are all of the reserves. The EA explains that the reserves will include some no treatment areas and that reserves will be implemented or identified as the project proceeds. Those reserves will include areas with greater than 35 percent dense horizontal cover, areas that could be particularly high-quality denning habitat, and when the Forest Service identifies high-quality denning habitat, it will look at areas that are close to areas that might also provide food for the lynx. So it's considered this distribution and we'll ensure that the project is implemented with that distribution in mind. That goes back to my question, is that information going to be made public as it goes along? I have no information indicating that the Forest Service intends not to make it public. I don't think it intends, I don't know at this time. I think the fair response is that there's nothing to indicate that it won't make it public. Perhaps it's also useful to underscore here that because the Forest Service prepared an EIS, or EA and not an EIS, its duty to provide information to the public was not as high as it might have been had it prepared an EIS. But it provided this information. Isn't that problematic? No, it's consistent with the regulations and also the case law describing the level of public. So it's consistent with the regulations for EAs, right? Yes. But doesn't that bolster their argument that how are they going to know what's happening as things go along? I think it would, to the extent that they are concerned about the level of disclosure, it would be a challenge to the fact that the Forest Service is proceeding according to the regulations governing EAs. And here the record shows that the Forest Service analyzed the information available to it and determined that there would be no further, no significant environmental impact. Their argument is they should be doing more than just EAs. I understand. I think this is a point where the Forest Service decided, given its expertise, that collecting further information would not be a productive exercise given all of the information it already had about the project area. Let me ask one question about that. What about Peter McDonald's email? He seemed to be saying that you did need site-specific information. Why was that not persuasive to the Forest Service? Or am I misconstruing what Mr. McDonald said? I don't have the language of Mr. McDonald's email in front of me. I'm sorry. It's referred to in Wilder's briefing. I think the Forest Service at large determined, as I've explained, that the information available to it didn't warrant preparing an EIS to the extent that there was some disagreement within the Forest Service that indicates that the Service considered a variety of viewpoints and it doesn't reflect that its ultimate decision was arbitrary or capricious. If I could touch briefly on denning habitat, the Forest Service will implement the project in a way that preserves this denning habitat or high-quality habitat, that's habitat with greater than 35 percent dense horizontal cover. But when they analyzed the region and the lynx habitat in this region, it determined that denning habitat would not be a limiting factor for lynx given the vegetation mix already in the area. Analyzing the impacts for this project at the LAU level rather than at specific habitat type level was consistent with the SRLA and the information available to the Forest Service. When you say it won't be a limiting factor, there's abundant denning habitat, as that was saying, and so the amount of work that the project contemplates would not substantially reduce that or wouldn't reduce it below the level needed. Is that what you mean by not a limiting factor? That's correct. The record shows that in each LAU in this area, there's usually an average of 20 to 40 percent denning habitat. The project, as I've also explained, is designed to protect that habitat and ensure that it will not be clear-cut. So that was a reasonable determination at this time. Also, although the Forest Service hasn't yet identified at the stand level where treatments will occur, this project is subject to a variety of monitoring measures that will ensure that if the project is not proceeding according to plan or the way it was evaluated in the EA, the Forest Service is able to make adjustments on the ground. It will report the acres of lynx habitat converted to unsuitable habitat to the Fish and Wildlife Service consistent with its obligations under the SRLA, and it will also ensure that habitat that is used for denning purposes is blocked off and also reported to the Fish and Wildlife Service. So in that respect, there will be public disclosure? Well, it will be reported to the Fish and Wildlife Service. I'm not sure if it will be reported officially more broadly, but I think that the Forest Service would be happy to provide it if asked. For those reasons, we ask that the Court affirm. Thank you very much. I think your time has expired, but I'll give you four minutes to respond. Thank you, Your Honor. So a few quick points in response. To go back to just the very recent conversation about denning habitat and whether or not it's a limiting factor. Yes, the record says that denning habitat is not a limiting factor for lynx, but when you look at what the U.S. Fish and Wildlife Service says, it says that an attribute does not need to be limiting for it to be vitally important to lynx persistence. It says that lynx will not occupy an area unless it has it. So even though it might not be limiting, it's a vitally important and key aspect of that habitat. Importantly, the Forest Service predicts that if it does impact that denning habitat, those impacts will remain for 150 years. So asking the Forest Service to look at what exists now, let's just get that baseline data, figure it out, is inherently reasonable when we're talking about a 150-year time frame before that denning habitat will return on the landscape. I also want to point out about the pre-commercial thinning. Council for the Forest Service said that that will occur within the SRLA guidelines, but that ignores the fact that we still don't know where exactly that will take place. The Forest Service admits they know where it will be, and so why can't that be disclosed to the public so we can talk about that, especially because that pre-commercial thinning is subject to that lesser 1% cap. I thought she said it was disclosed in the EA. I don't agree with that. I think I misunderstood. I heard that too, and that is not my reading of the EA. It only says that they pre-identified the pre-commercial thinning units. How can they pre-identify it if things might change over the period of time they're doing it? I would assume that the Forest Service had gone out and identified areas that, in their opinion, needed the pre-commercial thinning, which is basically thinning the understory to open it up and try to provide some more clearing in that habitat. That is very important because it's that understory, which you might have seen in the briefing the phrase dense horizontal cover. That's really important to lynx, especially in the winter. Clearing that out has a very big impact on lynx. But it's less than 1% of the LAU. Isn't that correct? Pre-clearing? That's what the Forest Service concluded in the environmental analysis. I also want to go back to the fact that the SRLA is just looking at these large, aggregate, gross acreage numbers. In the supplemental appellant appendix that was submitted along with the reply brief, Wild Earth Guardians explicitly included sections from the SRLA that specifically says that site-specific conditions, considering the characteristics of lynx habitat there, should be disclosed in these environmental analyses. I thought you were claiming that they violated the SLRA. We don't have any claims in this case that they violated the SRLA. We only have claims under the National Environmental Policy Act that they did not analyze and disclose the site-specific and baseline information specific to those two types of habitat, denning habitat and lynx winter habitat. I thought you just said you gave us specific sites to the SLRA that they haven't followed. That's not what you said. It's not, Your Honor. The Forest Service asserts it's complying with the SRLA, and we are not challenging that here. What did you just say about the supplemental appendix? The supplemental appendix specifically says that analyses about logging and lynx habitat require that site-specific conditions, considering the characteristics of lynx habitat there, be disclosed, and that's at the supplemental appendix at page one. Isn't that saying they violated the SLRA? I'm confused. It could be, but that was not a claim in the complaint below, but I think that still impacts the NEPA analysis. If they're saying they comply with everything in the SRLA, and the SRLA says you need to do this site-specific analysis looking at what the habitat looks like now and that's missing, we say that that violates the National Environmental Policy Act's duty to disclose and analyze effects. Okay, you've gone. Thank you, Your Honor. Okay. Cases submitted to counsel are excused.